UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-22560-CIV-HUCK/DUBÉ

JULIA CHARNECO VILLANUEVA,

       Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Plaintiff (D.E. #12) and the Motion for Summary Judgment filed by the Defendant (D.E. #17) pursuant to a Clerk's Notice of Magistrate Judge Assignment entered by the Clerk of Court, Unites States District Court for the Southern District of Florida. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff, Julia Charneco Villanueva (hereinafter "Villanueva" or "Plaintiff").

## I. FACTS

Villanueva filed an application for supplemental security income on June 17, 2004. (R. 117-119).[1] The application, which asserted disability as of January 1, 2003, was denied initially and on reconsideration. (R. 29-30, 58-61, 65-68). Following a hearing (R. 313-346), the ALJ issued a decision denying the request for benefits. (R. 13-28). A request for review filed with the Appeals Council was denied. (R. 5-8).

_____

1. All references are to the record of the administrative proceeding filed as part of the Defendant's answer.

The Plaintiff, age 45 at the time of the hearing on December 18, 2007, testified she was currently living with her son and boyfriend. (R. 318). Villanueva stated her highest level of education was the second year of college and she last worked as a sorter for UPS in 2000. (R. 318-319). The Plaintiff explained that she broke her ankle and stopped working but upon returning she needed to stop again because she would fight with the other workers. The Plaintiff testified she felt intimidated because of the fast paced nature of the job. (R. 319). According to Villanueva, she could not keep up with the pace of the work because of her ankle and the job requirement to spend the day on her feet. The Plaintiff testified that it took her 3-months to recover from her ankle injury and she found another job afterwards at a poultry factory. Villanueva said she was laid off from the poultry company because they were going bankrupt. (R. 320).

The Plaintiff stated she then moved to Puerto Rico to be with her family and she did not work while she was there. The Plaintiff also stated she moved to Puerto Rico because she could not find work. Villanueva testified she could not currently work because of her inability to get along with co-workers and she explained the problem more specifically as follows:

> Well usually what happens is I will start a job –
>
> ...
>
> -- and I'll win up you know, getting into some fights or, my anger's
> very, very uncontrollable. And for some reason or another I will wind
> up getting into fights or blowing up or something would happen.

(R. 321). The Plaintiff stated that in addition to the fight at the UPS job, she also got into altercations with co-workers at previous jobs. Villanueva explained that while working at a law firm, she got into an argument with her supervisors, threw papers, turned a desk upside down and "stormed out." She further stated that her main problem is getting along with authority. (R. 322).

According to the Plaintiff, she has problems communicating with people because she feels intimidated by them. She feels she will be criticized for what she says. Villanueva testified she has had this problem her entire life. The Plaintiff explained she stopped attending college after two years because her parents moved and she needed to start working. The Plaintiff said her longest job was at UPS and at a stationary store, both of which lasted a year. (R. 323). The Plaintiff stated she started therapy in 2004 because of domestic violence and because she tried to kill her ex-husband. She explained that the therapy initially started as group therapy and was court ordered. (R. 324). Villanueva further testified she gave custody of her children to her ex-husband because she was concerned that she might abuse them. (R. 326-327). With regard to her children, the Plaintiff stated as follows:

> And I couldn't deal with them. And I was going to try to go to work. And at that time my husband saw that I was having trouble with them. And he says look, let me take the kids off your hands, get yourself together, try to find yourself a job. When the kids are old enough, you know, I'll give them back to you.

(R. 327).

Additionally, the Plaintiff stated she gave her ex-husband custody of her children who are ages, 11, 13 and 17 in 1999 or 2000 and they currently live in Puerto Rico. Villanueva testified she has contact with her children and a good relationship with them. She further stated her oldest son came back to live with her two months prior to the hearing because he wanted to attend college and work. (R. 328). The Plaintiff added that her son is working for his father in an auto body shop. The Plaintiff testified that when she is at home, her son and husband know not to bother her because any little thing can make her "explode." (R. 329).

According to Villanueva, she gets angry when she needs to pick up after other people, when

3

she is criticized, or when she does not get her way.  She explained these explosions as follows:

> ... I'll throw things.  I'll verbally say, get abusive.  I mean I'll actually pick up a bed and throw it, you know.  I've done it.  Just a few weeks ago I took this mirror and I, I don't even remember what the fight was about.  And I took the mirror and I just threw it all over the floor....

(R. 330).  The Plaintiff added that afterwards she feels bad about her behavior.  The Plaintiff said the medication she takes does not prevent her from exploding but they make her feel more at ease.  (R. 331).

Villanueva testified she takes her medication every day, but when she feels she is getting upset she will take an extra pill to calm herself down.  A side effect of her medication is she gets sleepy. (R. 332).  The Plaintiff testified she and her husband used to abuse crack and they stopped one year prior to the hearing because she had hit "rock bottom."  She added that they attend church and try to do physical activities but sometimes her husbands gets upset with her because she does not want to leave the house due to depression. (R. 333).  The Plaintiff stated there are about 20 days a month where she does not feel like leaving the house and that it puts a strain on her relationship even though her husband is understanding and wants her to get better.

Villanueva stated she has trouble sleeping and takes pills to help her sleep. (R. 334).  She also stated that sometimes she sleeps 2 hours during the day. (R. 334-335).  The Plaintiff explained that she could not sleep because she would have racing thoughts and would pace back and forth.  She further testified that even when she would sleep, she would wake up after an hour and then remain awake for another 2-3 hours.  When Villanueva leaves the house she is paranoid that people are looking at her and criticizing her.  The Plaintiff testified she has problems with her memory and cannot remember what she is doing from one moment to the next. (R. 335).  According to the Plaintiff, she

4

makes simple meals like sandwiches, salads, soups and things that can be made in the microwave. (R. 335-336). The Plaintiff also stated she does not use the stove because she has epilepsy and is worried she will get burned. She added that because of her epilepsy she does not bathe or drive.

The Plaintiff explained she gets about 3 seizures a month and they come without warning. She added that sometimes she remembers them and she has been hospitalized at Jackson Memorial Hospital because of the seizures. (R. 336). The Plaintiff said that although she takes medication, she still has seizures. According to Villanueva, after a seizure she gets a headache and needs a day to recover because she is drained. (R. 337). She further testified that aside from the incident where she hit her husband with a rock, she stabbed him on his hand on a separate occasion. The Plaintiff stated that on both occasions, she was under the influence. The Plaintiff said the drugs are not the reason she would get upset and although she stopped using drugs she still gets upset emotionally. (R. 338).

In addition to the Plaintiff's testimony, Susan Lazarus, a vocational expert, testified at the Plaintiff's hearing. (R. 339). The VE described the Plaintiff's past relevant work as cashier checker, DOT #211.462-014, semi-skilled, light with an SVP of 3; and mail sorter, DOT #209.687-026, unskilled and light. (R. 344-345). The VE testified that someone capable of performing unskilled, light work, could perform the sorter job. The ALJ then asked the following hypothetical question:

> ... same age and educational level as our claimant here with a hypothetical person who could only adjust to or get along with supervisors, co-workers and public on an occasional basis. Would there be any jobs?

(R. 345). The VE opined that such a person would not be able to hold any jobs as the occupational base would be severely eroded. (R. 346).

In addition to the testimony presented at the hearing, medical records were submitted to the

5

ALJ. However, a review of the medical records and the specific issues raised by the Plaintiff in her Motion for Summary Judgment shows that the resolution of the issues do not require this Court to specifically set out all the medical evidence in detail. Accordingly, this Court will discuss the legal issues involved and will incorporate the facts as appropriate within the arguments presented below.

After a hearing and review of the record, the ALJ issued an opinion finding that the Plaintiff had the following severe impairments: a seizure disorder, crack addiction and a mood disorder. The ALJ further found that the Plaintiff's impairments, including the substance abuse disorder, meet sections 12.08 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)). (R. 21). The ALJ found that if the Plaintiff stopped the substance abuse, the remaining limitations would cause more than a minimal impact on the Plaintiff's ability to perform basic work activities, and therefore, the Plaintiff would continue to have a severe impairment or combination of impairments. (R. 24).

The ALJ also determined that if the claimant stopped the substance abuse, the Plaintiff would not have an impairment or combination of impairments that meets or medically equals a listed impairment. The ALJ next found that if the Plaintiff stopped the substance abuse, the Plaintiff would retain the residual functional capacity to perform light work except for exposure to unprotected heights and operation of dangerous machinery. (R. 24). The ALJ concluded that if the Plaintiff stopped the substance abuse, the Plaintiff could return to her past relevant work as a mail sorter, and thus, was not disabled within the meaning of the Social Security Act. (R. 27-28).

## II. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995); Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988). The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See, Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See, Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Baker v. Sullivan, 880 F.2d 319, 321 (11th Cir. 1989).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991); See also, Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

Social Security regulations establish a five-step sequential analysis to arrive at a final

determination of disability. See, 20 C.F.R. section 404.1520; 20 C.F.R. section 416.920 (a)-(f).

The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. section 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If such a finding is not made, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. section 404.1520(c).

At step three, the ALJ compares the claimant's severe impairments to those in the listing of impairments. 20 C.F.R. section 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. See, Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. section 404.1520(d).

Step four involves a determination of whether the impairments prevent the claimant from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show, at step five, that there is other work available in the national economy which the claimant can perform. 20 C.F.R. section 404.1520(e)-(f).

The claimant bears the initial burden of proving that he is unable to perform previous work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The inability to perform previous work relates to the type of work performed, not to merely a specific prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

The Plaintiff's first point of contention is that the ALJ erred in not finding that the Plaintiff ceased her substance abuse and that the substance abuse was not a material factor contributing to the disability. 20 C.F.R. § 416.935 states:

> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, [unless we find that you are eligible for benefits because of your age or blindness.]
>
> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.
>
> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
> (I) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535 (a)-(b) and 20 C.F.R. § 416.935 (a)-(b).

To make this determination we view the individual in periods of abstention from use and determine whether there is improvement in her overall medical condition.

In the instant matter, the ALJ determined that the Plaintiff's severe impairments included, a

seizure disorder, crack addiction and a mood disorder. Contrary to the Plaintiff's testimony, the ALJ

did not find that the Plaintiff's substance abuse had stopped, and therefore, the ALJ reviewed the

record from the perspective of whether the Plaintiff's remaining impairments would be disabling if the

Plaintiff's substance abuse had stopped. The Plaintiff specifically contends that the ALJ committed

reversible error in not finding that the Plaintiff's substance abuse had in fact stopped.

The burden of proving that drug or alcohol abuse is not a contributing factor material to the

disability falls on the Plaintiff. Brown v. Apfel, 192 F. 3d 492 (5th Cir. 1999). In the instant case, the

Plaintiff claims that the Plaintiff's drug use stopped as of October 27, 2006. (R. 237). With regard to

the Plaintiff's crack cocaine usage, the ALJ stated as follows:

> Camillus Health Concern notes show that the claimant acknowledged
> crack cocaine use on October 27, 2006. At this time, she was non-
> compliant with treatment, with diagnosis of borderline personality
> disorder and polysubstance abuse, with bipolar disorder checked off,
> and a GAF score of 65 (Exhibit 46F). The diagnoses were the same on
> August 13, 2007, with a GAF score of 60. Again, the claimant had
> been non-compliant. She had not been seen since October 2006. She
> had had an angry outburst, and was arrested for domestic violence
> (Exhibit 47F). I note that, on September 21, 2007, she was on
> medications, off of crack (a history of polysubstance abuse), and
> reported fewer mood swings and angry outbursts (Exhibit 48F). She
> reported on September 25, 2007 that her last use of crack was on
> October 27, 2006 (Exhibit 60F).
>
> I note that, when the claimant was seen on October 25, 2006, she was
> reported to be non-compliant with seizure medications, Exhibit 101F.
> The record is replete with references to non-compliance with
> prescribed treatment and this is, in and of itself, a basis for denial of
> benefits.
>
> On December 19, 2006, the claimant was reported to be without
> medications for two months (Exhibit 107F). On December 19, 2006,
> an emergency treatment admission, she was back on medications, with
> use of crack cocaine denied. A mood disorder, not specified, was

> diagnosed, and it was characterized as "mild," with a GAF score of 65
> (Exhibit 109F).  Her history of non-compliance with medications was
> noted (Exhibit 110F).

(R. 23).  With regard to the Plaintiff's substance abuse, the ALJ stated as follows:

> Moreover, I have considered the September 25, 2007 statement of
> Jesse Faxas that the claimant's substance abuse was in remission, as of
> October 27, 2006, and that the claimant would be disabled even is she
> did not abuse drugs.  I discount it as the claimant's allegations of not
> using are of limited credibility in view of her long history of substance
> abuse and, moreover, the record as set forth above establishes that, in
> the absence of the abuse, the claimant would have the ability to
> perform the unskilled light exertion specified below (Exhibit 60F).

(R. 27).

On September 25, 2007, the Plaintiff underwent a consultative examination with Dr. Rene F. Rocha. (R. 263-267).  During the mental status examination it was noted that the Plaintiff put forth little effort and appeared to be exaggerating her difficulties.  The doctor further noted that present results could not be considered valid of the Plaintiff's optimal potential.  Dr. Rocha noted that the Plaintiff's speech was clear and fluent, and mood and affect were euthymic. (R. 264).  Dr Rocha further found that the Plaintiff was oriented on 10 of 10 questions; her memory was influenced by motivational factors, but immediate memory she repeated 5 digits forward and 3 backwards; recent memory she remembered 1 of 3 objects after 15 minutes; and remote memory she remembered the last 3 Presidents of the United States. (R. 264-265).

Dr. Rocha found the Plaintiff's insight was limited and judgment was good.  Dr. Rocha also administered the Rey 15 test of malingering which concluded mixed and borderline malingering; but also noted that other indications throughout testing situations confirmed the poor efforts.  The Plaintiff was also administered the Wechsler Memory Scale which found the Plaintiff working memory in the

11

extremely low range. (R. 265). Again the doctor noted the Plaintiff's poor effort. The Plaintiff's MMPT-II profile appeared invalid because of faking and exaggeration of symptoms. (R. 266). Dr. Rocha's diagnoses was r/o delusional disorder, malingering, bipolar disorder by history; rule-out cognitive disorder NOS; seizure disorder; and occupational difficulties. Dr. Rocha assigned a GAF score of 50. (R. 267).

The ALJ properly determined that the opinion of Dr. Rocha had limited evidentiary value because of the lack of effort of the Plaintiff's part, and because Dr. Rocha who only evaluated the Plaintiff on one occasion, relied almost exclusively on the questionable results of standardized psychological testing. (R. 26-27). The ALJ also noted that the report had very little in the way of medical history and did not address the Plaintiff's substance abuse. (R. 27).

On September 25, 2007, a Medical Assessment of Ability to do Work-Related Activities (Mental) was completed by Jesse Faxas. (R. 258-260). The Assessment stated that the Plaintiff's ability to make occupational adjustments is "poor or none" in all areas. "Poor or none" is defined by the Assessment as, "no useful ability to function in this area." (R. 258). Further, the Assessment states that the Plaintiff's ability to understand, remember and carry out simple job instructions is "fair;" ability to understand, remember and carry out detailed but not complex job instructions is "poor or none;" and the Plaintiff's ability to understand, remember and carry out simple job instructions in "good." (R. 259). "Fair" is defined by the Assessment as "ability to function in this area is seriously limited, but not precluded;" and "good" is defined as, "ability to function in this area is limited but satisfactory." (R. 258). The Assessment notes that the Plaintiff's ability to maintain personal appearance is "good" and her ability in all other areas of making personal-social adjustments was "poor or none." (R. 259).

On the same day, Jesse Faxas also completed an Effect of Alcohol and Drug Abuse form.

12

Jesse Faxas stated that the Plaintiff does not suffer from schizophrenic paranoid or other psychotic disorders, but does have an affective disorder and a substance addiction disorder. The form stated the Plaintiff's substance disorder had been in remission since October 27, 2006, and the Plaintiff would be disabled even if she did not abuse alcohol or drugs. (R. 237).

With regard to these evaluations, the ALJ stated as follows:

> The record contains a September 25, 2007 residual functional capacity assessment stamped "Jesse Faxas, ARNP." It indicated that the claimant had a poor or non-existent ability to perform virtually all specified work related functions. "Jesse Faxas, ARNP" is stamped on the document but "Ph.D" is handwritten after the stamped title (Exhibits 35F-37F).

> A license verification with the State of Florida indicated that this individual is a nurse practitioner and not a Ph.D. as alleged. In fact, this individual was self-described as an ARNP in the Camillus Health Concern clinical notes (Exhibits 47F and 48F).

> The record is further misleading in that Jesse Faxas is indicated as prescribing doctor in the medication list (Exhibit 114). These misrepresentations in the record, in and of themselves, greatly erode the credibility of any statements of this individual. The opinions and assessments of this individual, a nurse practitioner who is not an acceptable medical source are discounted as unsupported by and inconsistent with the balance of the record, Social Security Ruling 06-03p.

(R. 27).

Social Security Regulation 06-03p defines "other sources" as follows:

> In addition to evidence from "acceptable medical sources," we may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:

> • Medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, licensed clinical social

workers, naturopaths, chiropractors, audiologists, and therapists; and

• "Non-medical Sources" including, but not limited to:

• Educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers;

• Public and private social welfare agency personnel, rehabilitation counselors; and

• Spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers.
Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

SSR 06-3p.

The ALJ properly evaluated the opinion of Jesse Faxes in accordance with the regulations and explained why it was discounted. In addition to the opinion evidence, medical evidence from October 27, 2006 and onward was submitted. A progress note from Camillus Health Concern notes that the Plaintiff reported using crack cocaine in the previous month and the Plaintiff's polysubstance abuse problem was "on and off." (R. 250). The Plaintiff contends that notes regarding when the Plaintiff was Baker Acted on December 19, 2006, and the lack of evidence of substance abuse further demonstrates remission as of October 27, 2006. However, a review of the evaluation does note that the Plaintiff denied substance abuse (R. 188), the area labeled "health risk factors" indicates that the Plaintiff drinks, but does not indicate drug use. (R. 190). As noted herein, the ALJ did not accept the argument that the Plaintiff was no longer using cocaine on the basis of her past history, lack of credibility and overall inconsistencies with the record.

Additionally, as noted above, the burden to prove that drug or alcohol abuse is not a

14

contributing factor material to the disability falls on the Plaintiff. It is the opinion of the Court that the

Plaintiff did not meet this burden nor demonstrate that the Plaintiff's drug abuse problem was in

remission. Therefore, the ALJ did not err in determining the abuse problem was not in remission, in

accordance with the regulations. Next, the ALJ must determine whether the substance abuse was a

contributing factor material to the finding of disability.

The Plaintiff argues that even when the Plaintiff's substance abuse if not considered, the

Plaintiff meets Listings 11.02, 11.03, 12.02A & B, 12.08 and 12.09. The Eleventh Circuit reviewed

listing impairments and stated as follows:

> The Listing of Impairments describes, for each of the major body
> systems, impairments which are considered severe enough to prevent
> a person from doing any gainful activity. *See* 20 C.F.R. § 404.1525(a).
> Part A of the Listing of Impairments contains medical criteria that
> apply to adults age 18 and over. *See* 20 C.F.R. § 404.1525(b); *see also*
> 20 C.F.R. § 404, Subpt. P, App. 1. To "meet" a Listing, a claimant
> must have a diagnosis included in the Listings and must provide
> medical reports documenting that the conditions meet the specific
> criteria of the Listings and the duration requirement. *Id.* 20 C.F.R. §
> 404.1525(a)-(d). To "equal" a Listing, the medical findings must be 'at
> least equal in severity and duration to the listed findings.' *See* 20
> C.F.R. § 404.1526(a). If a claimant has more than one impairment, and
> none meets or equals a listed impairment, the Commissioner reviews
> the impairments' symptoms, signs, and laboratory findings to determine
> whether the combination is medically equal to any listed impairment.

Wilson v. Barnhart, 284 F. 3d 1219 (11th Cir. 2002). Additionally, the burden of establishing that an

impairment meets a listing is on the Plaintiff. Bell v. Bowen, 796 F. 2d 1350, 1353 (11th Cir. 1986).

With regard to the listed impairments, Medical Listings 11.02 and 11.03, state as follows:

> 11.02 *Epilepsy - convulsive epilepsy, (grand mal or psychomotor)*,
> documented by detailed description of a typical seizure pattern,
> including all associated phenomena; occurring more frequently than
> once a month, in spite of at least 3 months of prescribed treatment.

15

With:

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

11.03 *Epilepsy - nonconvulsive epilepsy (petit mal, psychomotor, or focal)*, documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Part 404, Subpt. P, App. 1, 11.02, 11.03.   The Plaintiff has failed to meet the burden required; specifically that she was having seizures more frequently than once weekly in spite of at least 3 months of prescribed treatment.   The record shows that the Plaintiff consistently was non-compliant with her medications, and does not demonstrate that when taking her medications that she met the listing requirement. (R. 192, 196, 249-252).   In fact, as the Defendant correctly notes, the record shows that when the Plaintiff took her medications, she did not have seizures. (R. 218).

Additionally, the ALJ specifically noted:

I note that, when the claimant was seen on October 25, 2006, she was reported to be non-compliant with seizure medications, Exhibit 101F. The record is replete with references to non-compliance with prescribed treatment and this is, in and of itself, a basis for denial of benefits.

(R. 23).   While the ALJ must consider whether a claimant meets a listing, the ALJ need not mechanically recite that a claimant does not meet a listing in his decision, as this fact may be implied from the record. Hutchinson v. Bowen, 787 F. 2d 1461, 1463 (11th Cir. 1986).

With regard to the listed impairments 12.02, 12.08 and 12.09, the regulations state:

> **12.02** *Organic mental disorders*: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
>
> 1. Disorientation to time and place; or
>
> 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
>
> 3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
>
> 4. Change in personality; or
>
> 5. Disturbance in mood; or
>
> 6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
>
> 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., Luria-Nebraska, Halstead-Reitan, etc;
>
> AND
>
> B. Resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or

pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

G. Gastritis. Evaluate under 5.00.

H. Pancreatitis. Evaluate under 5.08.

I. Seizures. Evaluate under 11.02 or 11.03.

**12.08** *Personality disorders*: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

1. Seclusiveness or autistic thinking; or

2. Pathologically inappropriate suspiciousness or hostility; or

3. Oddities of thought, perception, speech and behavior; or

4. Persistent disturbances of mood or affect; or

5. Pathological dependence, passivity, or aggressivity; or

18

6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

**12.09 *Substance addiction disorders***: Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.

The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied.

A. Organic mental disorders. Evaluate under 12.02.

B. Depressive syndrome. Evaluate under 12.04.

C. Anxiety disorders. Evaluate under 12.06.

D. Personality disorders. Evaluate under 12.08.

E. Peripheral neuropathies. Evaluate under 11.14.

F. Liver damage. Evaluate under 5.05.

20 C.F.R. Part 404, Subpt. P, App. 1,12.02, 12.08, 12.09.

The ALJ reviewed the listing requirements in detail and determined that the Plaintiff met the listing requirements when the substance abuse was included. (R. 21-22). With regard to whether the Plaintiff met a listing requirement had she stopped the substance abuse, the ALJ reviewed the four areas of function and determined that the Plaintiff would have no limitation in the area of daily living; mild limitations in the area of social functioning; moderate limitation in the area of concentration, persistence or pace; and no periods of decompensation. (R. 24). The Plaintiff, while noting that the

ALJ previously found that the ALJ already determined that 12.08 and 12.09 were met[2], did not provide relevant evidence that when substance abuse was not considered the Plaintiff would meet the listing requirements. The evidence used in support by the Plaintiff was discussed above and it was previously the opinion of this Court that said evidence was properly discounted.

The Plaintiff also contends that the ALJ improperly rejected the Plaintiff's credibility.

The credibility of the Plaintiff's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb, at 702. If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Wilson v. Barnhart, 284 F. 3d 1219, 1225 (11th Cir. 2002). Failure to articulate the reasons for discrediting subjective testimony requires as a matter of law, that the testimony be accepted as true. Id.

If an ALJ rejects a claimant's testimony on credibility grounds, the ALJ must explicitly state as much and give adequate reasons for that determination. Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995). There is no requirement that the ALJ refer to every piece of evidence, but the credibility determination must not be "a broad rejection." Dyer, 395 F.3d at 1211. Failure to set out the reasons for the discrediting of subjective pain testimony mandates, as a matter of law, that the testimony be accepted as true. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).

In the instant matter, it is the opinion of this Court that the ALJ properly complied with the regulations and with the Eleventh Circuit requirements. Specifically, the ALJ noted that according to the Plaintiff, due to her seizure disorder she cannot be alone bathing or use the stove; however, she

---

3. The Court again notes, that the ALJ found that Medical Listings 12.08 and 12.09 were met only when the Plaintiff's substance abuse was included.

indicated that she also has no difficulty with bathing or self-care. Additionally, the Plaintiff testified that she could cook simple meals and the record indicates she does cleaning, makes her bed and sweeps. The ALJ further noted that while the Plaintiff reported continued anger issues, the record did not demonstrate any more attacks on her boyfriend. The ALJ noted that this was inconsistent with her testimony that her mood does not change when she is using drugs. Lastly, the ALJ noted that in addition to the inconsistencies between the Plaintiff's testimony and the record, the record also indicated reports of lack of cooperation and malingering. (R. 26, 178, 335-336). As noted above, the ALJ pointed to the non-compliance with treatment. (R. 23). Accordingly, it is the opinion of this Court that the ALJ's decision regarding the Plaintiff's credibility was supported by substantial evidence.

The Plaintiff further contends that the ALJ improperly determined the Plaintiff's RFC and that the Plaintiff could return to her past relevant work.

The residual functional capacity is an assessment which is based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997), citing, 20 C.F.R. § 404.1545(a). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess ... her work-related abilities on a function by function basis.... Only after that may RFC be expressed in terms of exertional levels of work, sedentary, light, medium, heavy, and very heavy." Freeman v. Barnhart, 220 Fed. Appx. 957, 960 (11th Cir. 2007).

The Plaintiff contends that the ALJ improperly failed to explain or properly evaluate the effect that the Plaintiff's multiple impairments would have on her ability to work.

The RFC assessment must first identify the individual's functional

21

> limitations or restrictions and assess his or her work-related abilities on
> a function-by-function basis, including the functions in paragraphs (b),
> (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may
> RFC be expressed in terms of the exertional levels of work, sedentary,
> light, medium, heavy, and very heavy.

SSR 96-8p (4).

In the instant matter, the ALJ reviewed each of the Plaintiff's impairments (both incorporating substance abuse and without), the ALJ further evaluated the medical evidence, the opinion evidence and the Plaintiff's credibility. Only after a review of the entire record, did the ALJ formulate the Plaintiff's RFC. Specifically, the ALJ found that the Plaintiff could perform light work except for exposure to unprotected heights and operation of dangerous machinery. (R. 24). The ALJ then determined that based on the Plaintiff's RFC, she could return to her past relevant work as a mail sorter. As the RFC is based on all the relevant evidence of record, and the Plaintiff's past relevant work falls within the limitations determined by the ALJ, it is the opinion of this Court that no error is present.

The Plaintiff's final point of contention is that the ALJ failed to apply proper standards and entitlement is clear from the record. Specifically, the Plaintiff contends that there was no good cause to reject the opinions of treating and examining psychiatrist and psychologists; no good cause to discredit the Plaintiff's testimony; and that the vocational expert's testimony showed the Plaintiff was disabled.

It is the duty of the ALJ to fully and fairly develop the record. See, Graham v. Apfel, 129 F.3d 1420, 1422-23 (11th Cir. 1997). Development of a full record may include ordering a consultative examination to enable the ALJ to make an informed decision. Holladay v. Bowen, 848 F.2d 1206, 1209 (11th Cir. 1988); West v. Barnhart, 300 F.Supp.2d 1264, 1271 (S.D. Fla. 2003). The applicable

22

regulations also provide that a consultative examination may be obtained "when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision" on the claim. 20 C.F.R. §404.1519(a). The ALJ is also obligated to make every reasonable effort to obtain all medical evidence necessary from the claimant's treating physician to make a determination. See, Sellers v. Barnhart, 246 F.Supp.2d 1201, 1210 (M.D. Ala. 2002); 20 C.F.R. §404.1512(d).

For the reasons set forth above, it is the opinion of this Court that the final argument is without merit. The ALJ reviewed and analyzed all of the Plaintiff's alleged impairments along with the treatment records of her treating physicians and the consultative examinations by the State Agency physicians. The ALJ further reviewed the Plaintiff's testimony and after reviewing the entire record formulated her opinion. The Plaintiff has not demonstrated the kind of gaps in the evidence necessary to demonstrate prejudice. Graham v. Apfel, 129 F. 3d 1420, 1422 (11th Cir. 1997).

It is this Court's opinion that based on the aforementioned the ALJ's opinion is supported by the substantial evidence in the record.

### III. CONCLUSION AND RECOMMENDATION

Based on the foregoing, this Court finds that the decision of the ALJ was supported by substantial evidence and that the correct legal standards were applied. Therefore, it is the recommendation of this Court that the decision of the Commissioner be **AFFIRMED**. Accordingly, the Motion for Summary Judgment filed by the Plaintiff (D.E. #12) should be **DENIED** and the Motion for Summary Judgment filed by the Defendant (D.E. #17) should be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Paul C. Huck, United States District Judge. Failure to file objections timely shall bar the

parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this __25__ day of May, 2010.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE

24